JAMES L. CLARKSON, Respondent, v. MARTHA J. CLARKSON, Appellant.

### St. Louis Court of Appeals, May 11, 1886.

1. DIVORCE—APPELLATE PRACTICE.—In an action for divorce where the petition states a cause of action under the statutes and the answer sets up facts which would defeat a recovery, and both are fully supported by the evidence of the parties themselves, appellate courts must determine the relative truthfulness of the parties, in the absence of evidence of disinterested witnesses which would determine the question, and enter its decree according as it determines that question.

2. ——— EVIDENCE—PRIVATE COMMUNICATIONS, between husband and wife which are inadvertently admitted against precautions, and which can not affect the propriety of the finding under the other evidence, do not furnish ground for a reversal of the decree.
——— AFTER OCCURRING FACTS.—Evidence of facts which occurred after the suit was brought, to which no objection was offered at the trial, and which were alleged in an amended petition, is not ground for the reversal of the decree.

APPEAL from the St. Louis Circuit Court, GEORGE W. LUBKE, Judge.

*Affirmed.*

LODGE & TALTY and TAYLOR & POLLARD, for the appellant: In a divorce proceeding the husband and wife are not competent witnesses as to vituperative epithets addressed to each other while they are alone. Neither should be permitted to relate private utterances of any description which have been addressed by the one to the other. *Vogel v. Vogel*, 13 Mo. App. 588; *Miller v. Miller*, 14 Mo. App. 421; *Moore v. Moore*, 51 Mo. 118; *Buck v. Ashbrook*, 51 Mo. 539. The court erred in allowing Luthy, a hostile witness to the defendant, to state his opinion as to the effect of the defendant's conduct on the mind and character of the plaintiff.

His opinion was wholly incompetent. 1 Wharton on Evid., sects. 509–510; 2 Bishop Mar. & Div., sects. 285–286; *Richards v. Richards*, 1 Wright (Pa.) 225; *Hoffman v. Hoffman*, 43 Mo. 547, was a suit for divorce, and the court reviewed the evidence and reversed the decree below, because not sustained by the weight of evidence. *Nagel v. Nagel*, 12 Mo. 53; *Lewis v. Lewis*, 5 Mo. 278. The sole grounds alleged for divorce are indgnites, and the law is that these in themselves must have been sufficient to entitle the plaintiff to relief at the time the suit was begun, else relief should be denied. *Fernier v. Fernier*, 4 Edw. Ch. 296; *Angelo v. Angelo*, 81 Ill. 251; *Harper v. Harper*, 29 Mo. 301; 2 Bishop Mar. & Div., p. 89. The trial court erred in admitting in evidence what occurred subsequent to the beginning of said suit as grounds for such divorce. *Toome v. Toome*, 9 Ala. 452; *Tew v. Tew*, 80 N. C. 316; *Fernier v. Fernier*, 4 Edw. Ch. 296. To entitle the plaintiff to divorce, the injuries he complains of must have been inflicted without cause on his part. *Harper v. Harper*, 29 Mo. 301; *Doyle v. Doyle*, 26 Mo. 549; *Gillingwater v. Gillingwater*, 28 Mo. 60.

GEO. D. REYNOLDS and C. P. & J. D. JOHNSON, for the respondent: The rulings of the trial court as to the disclosure of private, privileged communications between husband and wife were in strict accord with the adjudications in this state. *Moore v. Moore*, 51 Mo. 118; *Buck v. Ashbrook*, 51 Mo. 539; *Vogel v. Vogel*, 13 Mo. App. 588; *Miller v. Miller*, 14 Mo. App. 421. The introduction, without objection, under the amended petition, of evidence of acts occurring after the filing of the suit is not ground for a reversal. *Butler v. Butler*, 4 Litt. (Ky.) 201; *Feigley v. Feigley*, 7 Md. 360; *McCrocklin v. McCrocklin*, 2 B. Monroe 370; *Steele v. Steele*, 35 Conn. 53; *Logan v. Logan*, 35 Com. 148.

LEWIS, P. J., delivered the opinion of the court.

Although at an expense of prolixity in statement, we copy the pleadings in this cause, as the best method of giving a clear understanding of the nature and scope of the controversy :

"Plaintiff for his amended and supplemental petition, made and filed by leave of court, states, as before, that on September 14, 1871, in the county of Callaway, in the state of Missouri, he was lawfully married to the defendant; that plaintiff continued to live with defendant as her husband from and after the day and year aforesaid until on or about July 26, 1883. That during all that time he faithfully demeaned himself and discharged all of his duties to the defendant as her husband, and at all times treated her with kindness and affection ; but the defendant, wholly disregarding her duties as the wife of plaintiff, offered and continued to offer at all times such indignities to plaintiff as rendered his condition intolerable, and which were so offered and continued from on or about one year after the date of said July 26, 1883. That the said indignities so offered plaintiff by defendant during said period, consisted of the following demeanor, acts, and language, that is to say, she at all times asserted and claimed to be better educated, more refined, and of better social standing in society than the plaintiff, the plaintiff's children, by his former marriage, and plaintiff's other relatives by blood and marriage, and would, during said period. so conduct herself in that regard as to produce the impression upon plaintiff, his said children and relatives that she, defendant, held them to be of low breeding, ignorant of the ordinary decencies of life, uneducated, and not fit to enter into that society which her social position permitted her to occupy and enjoy, and so by said conduct drove and compelled plaintiff to either abandon his social position or submit to be degraded by her therein, and so, to escape such treatment from her, he, his children, and

family were compelled to submit to her dominion in that behalf, and, also, to withdraw from their proper social position; that the defendant during said period, under her said asserted superiority, treated the plaintiff as of low breeding, ignorant and a vulgar person, and in criticising, finding fault with, and condemning his language, his action, and his conduct in general, and so treating his said children by his said former marriage, and the other members of his family and said relations, and that the defendant did also during the said period, endeavor to subjugate the said children of plaintiff by his former marriage to the control and dominion of her own children, she holding her own children to be superior and better than the said children of plaintiff. That she, during the said period, offered to the plaintiff cruel, wanton, and outrageous abuse in the presence of his family and other persons; that she, during said period, gave to the plaintiff and called him by opprobrious, degrading, and vile names, in the presence of his family and other persons.

"That she, during said period, offered and gave to plaintiff other vile, and vulgar, and indecent epithets, in the presence of his family and other persons. That she, during said period, applied to plaintiff's children and other members of his family, and in his presence, vile, vulgar, and indecent names, and gave to his said children barbarous blows, with the intent and purpose on her part to degrade said children, and to make the life of plaintiff miserable, unhappy, and unendurable. That she, during said period, gave to plaintiff vile, cruel, abusive, and bad treatment whilst he was sick in bed and unable to help himself, and inflicted upon plaintiff, whilst so sick in bed, blows and other bodily pains.

"That she, during said period, wantonly, maliciously, wrongfully, and falsely accused and charged this plaintiff with having committed the crime of adultery. That she, during said period, wantonly, maliciously, wrongfully, falsely. and without cause ac-

cused and charged plaintiff with having improper re-
lations and connection with other women, and made
said false charges of adultery and lewdness in the pres-
ence of plaintiff's family, and so made for the purpose
of degrading plaintiff and his said family. That she,
during said period, wrongfully and improperly applied
the plaintiff's money, set apart and given to defendant
for the support and maintenance of the plaintiff's
family. That she, during said period, with intent and
purpose of ruining the business standing and to harass and
annoy the plaintiff, and to impoverish him, converted to
her own use the money of the plaintiff, given her for the
support and maintenance of his family, and by creating
large debts against the plaintiff and without his knowledge
and consent, and which said purpose was continued by
her for a long time after said July 26, 1885, and long
after the bringing of this suit. That, during said period,
she, for said purpose, contracted a large debt on plain-
tiff's account, and without his knowledge and consent,
with the Guernsey Furniture Company, and fraudulently
permitted said company to procure judgment against
plaintiff without notice and without the knowledge of
plaintiff, to avoid which he is coerced to expend large
sums of money. That she, during said period, aban-
doned the plaintiff's bed and refused to sleep with him,
and absolutely refused to cohabit with or to have sexual
connection with plaintiff. That she, during said period,
formed the fell purpose and intent to ruin the
plaintiff in his good name and fame, in his fortune and
financial standing amongst those with whom he was
connected in business, his friends and neighbors in
general. Said fell intent and purpose of said defendant
were clearly manifested and fully culminated on her
part, since the bringing of this action, in the particulars
following, that is to say :—

"She, defendant, on or about June 16, 1884, at the
city of St. Louis, Missouri, before the court of criminal
correction, the said court then and there having jurisdic-

tion over the subject-matter, made complaints, not having probable cause to so believe, made oath, to her then administered by an officer of the said court, the said officer then and there being authorized to administer oaths in that behalf by law, that the plaintiff had, without good or reasonable cause, abandoned the said defendant, and failed and refused to support and maintain her, which complaint she well knew was false, and which she then and there made with the fell purpose and intent aforesaid, and that she, having so falsely complained and having so falsely charged the plaintiff with said crime, then and there caused a warrant to issue on which she procured plaintiff's arrest, thereby coerced him to answer the said false charge and accusation, which he did, though the trial thereof was by defendant delayed by vexatious continuances from time to time, and on his said answer he was duly acquitted of said false and groundless charge of the crime of abandonment, although she, defendant, had by said proceedings secured her fell purpose and intent, as before alleged, to the extent in compelling this plaintiff to expend large sums of money in his defence of said charge, in bringing before the public his family affairs, in forcing upon plaintiff great anguish of mind and in giving to him and all his family great distress and trouble. That said defendant, during said period, since then, up to, and since the bringing of this action, taught, and continued to teach, his infant children to disobey him, to treat him with disrespect and contumely, and to ignore all of their duties to him as their father, and particularly in the fact following, viz. :   That she, in the presence of Dr. Reber, the family physician, ordered and directed his said infant children to spit in plaintiff's face when plaintiff should at any time desire of them, or either of them, the privilege of giving them a manifestation of his love and affection by a kiss, and at all times to refuse to welcome him by a shake of the hands, or to in any wise to

recognize plaintiff as their father. Plaintiff further states that there were born of said marriage, and now living, two infant children, one a male of about the age of eleven years, and named after and for plaintiff, to-wit: James L., and one a female named Nancy Bell, and that the defendant is not a suitable person, on account of her bad temper, want of moral and religious disposition, indiscreet habits, vulgar and indecent conversation, imprudent and expensive habits, to have the custody, control, and education of said children. The plaintiff further states that he has resided within the state of Missouri one whole year and more, to-wit: For fifteen years next before the bringing of this action, and at the bringing of this action was a resident of said county of Iron. The plaintiff further states that the said defendant has an ample estate of her own, consisting of real and personal estate, money, and other property, and is also well able physically, by her own labor, to support herself without aid, help, or assistance from him; and, further, that she brought no property of her own to the marriage and to plaintiff, and has not since said marriage acquired any property other than that which the plaintiff has voluntarily given her.

"Plaintiff, therefore, prays the court that he may be divorced from the bonds of matrimony contracted, as aforesaid, with defendant, that he may have the care, custody, control, and education of his said infant children, and that defendant be compelled to support and maintain herself out of her own estate and by her own labor and exertion; and, also, for such and all relief which the facts and law shall warrant the court in giving." This petition was sworn to by the plaintiff.

The defendant filed a second amended answer as follows:

"Now at this day comes the defendant, and by leave of court first had, files this her second amended answer to plaintiff's amended petition, and states that she

admits that she was legally married to the plaintiff on or about the fourteenth day of September, 1871, in the county of Callaway and state of Missouri, and that the said two children, James L. and Nannie Belle Clarkson, were born of said marriage, but that she denies generally, all and singular, each and every other allegation in said amended petition contained.

" And answering further, defendant states, that for a period of over four years next before the filing of said petition the plaintiff has treated defendant with coldness and indifference, and that he has, pursued a system of almost continuous fault-finding about the most trivial matters of every-day life ; that he has, almost continually, during said period, treated her with marked disrespect in the presence of others, and has at divers times and places, and in the presence of others, used opprobrious epithets of and towards this defendant, calling her such names as 'devil' and 'liar,' and others of a like character, and did tell her that he would break every bone in her body, and that he would cut the hide off of her, and all this without any provocation whatever offered upon the part of the defendant ; that plaintiff during said period did repeatedly tell his children to disobey defendant, and on or about the first day of March, 1883, the plaintiff, without cause, became very much excited and angry with defendant, and, pounding upon the table with his hand, he said : 'Children, I want you to understand that you are not to ride with her,'—meaning defendant,—'and that you are not to mind her, or do anything she wants you to do.' That on or about the said day plaintiff entered a room in their residence where defendant was sitting quietly reading a newspaper, and, in an abusive and threatenting manner, said to her : ' You have got to stop the way in which you are acting,' and did strike the newspaper out of her hand, tearing the same, and then and there struck defendant in the face with his fist, and then and there said in the presence of others, 'If you dare to raise your

hand to my children, I will break every bone in your body and cut the hide off of you ; ' and that he then left the house and remained away all night, and that, after returning on the following day, he left again, saying that he was going to Florida, and remained away for a period of about six weeks ; that he has not lived at home one-half of the time that they have been married, and that plaintiff has pursued a systematic course of neglect, abuse, and threats ever since said marriage ; that he has almost constantly accused defendant of having mistreated his children, and threatened to beat defendant, and did strike and forcibly push her at divers times during their marriage, and did say that he believed she would poison his children ; that plaintiff has, on many occasions during said period, refused to speak to defendant for periods of two and three weeks at a time, and during said times he has refused to occupy the same bed or the same room with defendant, and at said times he refused to help, or wait on defendant, at the table when they were eating ; that on or about the twenty-sixth day of July, 1883, plaintiff abandoned defendant, and has ever since remained away from her and refuses to live with her, though often requested by her to do so ; that on or about the twenty-sixth day of June, 1884, he caused a circular to be printed and mailed to merchants and others with whom she was acquainted in the said city of St. Louis, warning them not to sell her goods or give her credit for anything she might purchase; that plaintiff has very often called defendant, in the presence of others, a 'liar' and a 'devil,' and did say to her when she was sick and confined to her bed that he wished she would die.

"Defendant further states that on or about the twenty-fifth day of October, 1884, the plaintiff, after having remained away from his home in Carondelet for over a year, visited the house with a carriage and several relations and assistants, during defendant's absence, and took a large quantity of wearing apparel belonging to

defendant, consisting of dress patterns that defendant had purchased with her own separate means, cloak patterns, silks, laces, and velvets, and did take all the money that she had in the house, including money that had been given to her by her mother before her death, and which on this account was prized very highly by her ; and plaintiff then and there stated that he was not going to let defendant keep anything, or keep any money to pay attorneys with to fight him in this case, and then and there plaintiff and his said assistants attempted to forcibly and violently abduct and carry away said children from defendant, with whom they are now and have been living ever since plaintiff abandoned her, as aforesaid, and then and there placed said children in a carriage despite their pleadings and entreaties to be allowed to remain at home with defendant, and, despite their screams, drove rapidly through the streets of said city to escape from defendant, who was following them, and would have succeeded in so doing had not the officers of the law compelled plaintiff and his assistants to return said children to defendant, and defendant alleges and avers that said unlawful and shameful taking of her goods, and attempt to so violently and forcibly abduct said children, as aforesaid, was done for the purpose of harassing and annoying defendant, and for the purpose of bringing defendant into public shame and disgrace. And defendant states that plaintiff has no love for said children ; that he has not visited his home to see them except on one or two occasions, since his abandonment of her, and that he has met them in public places and did not even speak to them.

"Wherefore, having fully answered, defendant prays that plaintiff's said amended petition be dismissed."

This answer was sworn to by the defendant.

The constantly recurring antagonism between the petition and the answer was rivalled at the trial by that in the testimony given by the parties, respectively. It is

impossible to believe all the statements made by both plaintiff and defendant. In a divorce case, it is the duty of this court, not so much to sift out possible errors in the proceedings below, as to ascertain, from the facts proved, what final result is pointed out by the demands of justice. We must analyze the testimony as best we can, and act upon the impressions created of its truth or falsehood, first of all. In the present case, there is little or no conflict among the stories told by the disinterested witnesses. But the most material facts are given in very contradictory shapes by the parties themselves. The plaintiff's testimony tends to verify every allegation in his petition. So of the defendant's testimony, as to her answer. If the petition and the plaintiff's story as a witness are literally true, they develop scenes of domestic misery, wrong, and injustice, without guiltiness on his part, which no human administration of our divorce laws would ever be likely to tolerate. If the defendant's pleadings and narrative are true, the plaintiff is far from being the innocent and injured party to whom a divorce may be granted. This condition of the record narrows down our task to the inquiry, shall the plaintiff, or the defendant only, be believed?

Appellate judges are at a serious disadvantage, comparatively, in determining such a question as this. The trial judge may sometimes see that the witness lies with his tongue, while his face tells the truth in spite of him. An over readiness in giving one class of answers, and a manifest reluctance about others; a cheerful attention to the questions for one side, and a surly indifference to those from the other; an emphasized minuteness about insignificant particulars, and a slurring over of others having a most important bearing; these, with many other expressions in demeanor, in tone of voice, and in the irrepressible pantomime of the eye, may shed a flood of light upon the feeling under which the witness testifies, and the extent to which it controls his candor, or his inclination to an unfair coloring of the facts. But,

while the reviewing judge is deprived of such aids as these, he may yet find reflected from the written or printed page a great many indications hardly less conclusive to the same ends. Whether the witness is so far controlled by his interest in the outcome of the cause, or by a strong feeling of partiality, or of hate, of revenge, or of personal affection, as to swerve, on occasion, from the line of truth to such an extent as safety will permit, may sometimes appear from his choice of language alone. A glossing over of unfavorable facts and a high coloring of the opposite sort; an affectation of tender sympathies, where the whole story demonstrates that their existence is impossible with him ; a frequent wilful misconception or perversion of the questions asked ; an uncalled for "smart" response, intended at once to evade the question and to belittle the questioner; an employing of the same fact argumentatively in one place, to show a certain state of things, and in another to prove the contrary ; all these and sundry other manifestations will help the reader of written testimony to pretty fair deductions of how much it ought to prove.

We have carefully read this entire record of seven hundred type-written pages. The mass of facts contained in it is too voluminous to be fairly abstracted in an opinion of reasonable length. We can only give the convictions gathered by us from the whole array, by way of reasons for the conclusion we have reached.

The story told by Mr. Clarkson, evidently under the influence of strong feeling, appears to be characterized by candor, straightforwardness, and an honest self-abnegation throughout. He does not spare himself where faults appear in his own conduct. He frankly, and in ample terms, concedes to his wife many of the highest adornments of her sex, and detracts nothing from certain features of her conduct that exemplified a high sense of wifely and motherly duty. There may be an occasional exaggeration as to her behavior in an opposite direction. But, if this be so, it is generally such

as would indicate in him a self-respecting and sensitive
nature, disposed to entertain enlarged views of any per-
sonal indignity.   Making all allowances on this account,
however, we still find persuasive proofs of insults, annoy-
ances, great and small, mortifications, and indignities
suffered by him, such as might easily make life a burden
to a man of even a low order of human sensibility.   On
the whole, the plaintiff's testimony, as it reads, is cal-
culated to inspire a belief that he does not wilfully
magnify his wrongs, as he naturally felt them.

Mrs. Clarkson's testimony is, in some respects, of a
different stamp.   She testifies, also, evidently, under
strong feeling.   She finds nothing to commend in her
husband's behavior, and little or nothing to confess as to
her own.   The first answer filed in her behalf included
a cross-bill and prayer for a divorce.   She afterwards
withdrew this, and directed her efforts to a defeating of
the plaintiff's application.   Her bitter descriptions of
the plaintiff as a domestic tyrant, at all times indifferent
to the welfare or happiness of his wife and children,
seems to bear a strange relation to her tearful zeal in
forefending a possible separation.   This, however, may
be natural enough, and in itself reflects no discredit on
her position.   But it seems to be closely allied to sundry
inconsistencies between her pleadings and her proofs,
between different parts of her own testimony, and be-
tween her own testimony and that of her witnesses.
Thus, her answer represents the household as a scene of
"almost continuous fault-findings [by the plaintiff]
about the most trivial matters of every day life," of
marked disrespect from the husband towards his wife,
and of his frequent application of opprobrious epithets
to her, with the most brutal threats and acts of personal
violence ; and all this "in the presence of others."   Her
own testimony substantially reiterates these charges.
Yet she introduced about seventeen witnesses, either in-
timate friends or constant visitors, or domestic servants
employed from time to time, all of whom described the

family as one of the most peaceable, loving, and happy, in every relation, that they had ever known. The developments first mentioned were well adapted to show that the plaintiff was not an innocent and injured party. The second, that there was no foundation in fact for the complaints in his petition. But it seems to have been overlooked that a harmonious consistency, in evidence of whatever description, is one of the most essential elements of credibility.

Much of the evidence had reference to existing relations between the defendant and the plaintiff's daughters by a former wife, Mrs. Clarkson professed the tenderest affection for her step-children, and undertook to show that the sentiment was fully reciprocated by them. Such were the unceasing demonstrations of this mutual feeling, that strangers, making acquaintance with the family, knew them intimately for a year or more, without ever suspecting the existence of other than the natural tie of mother and daughters. The daughters, however, who had since become grown and married, told a story diametrically the opposite. They represented their step-mother as habitually tyrannical, capricious, and violent with them, making their home a prison, subjecting them to irksome attendances upon her, exposing them to inclement weather for her convenience, and in many other ways depriving them of the comforts and enjoyments they felt themselves entitled to in their father's house. In this connection again, Mrs. Clarkson appears to depreciate the importance of consistency with herself. In another part of her testimony, she says of the girls: "Oftentimes they would be passing around the house, for instance, I would be sitting in my room, the back parlor, they would come up and see me sitting there, and they would make a mouth at me."

The defendant is equally unfortunate as to other witnesses. She testified that Mr. Stanton (one of her witnesses) proposed that she should hire some one to watch Mr. Clarkson. Mr. Stanton's account of this "proposal" is given thus: "She [Mrs. C.] said that

she had reason to believe that Mr. Clarkson was being influenced against her by some other woman. She then asked me whether I knew any private detective in St. Louis. She asked me whether I would see one for her and have the detective follow Mr. Clarkson to see where he went."

Among the plaintiff's accusations against the defendant was one that she had taught the children to treat him disrespectfully. Referring to a specification on this point, Mrs. Clarkson said that, in a conversation with Dr. Reber, that gentleman asked her if, on a certain occasion, the plaintiff had spoken to his children. She adds: "I said 'Yes, sir,' and Nannie Bell spoke and said 'Yes, and I ought to have spit in his face;' and I said, 'why, Nannie Bell, you must not talk that way,' and I turned and said to Dr. Reber, that was the first time I heard her speak a harsh word about her father." Dr. Reber's account of the same conversation is given in this way: "The point came up that Mr. Clarkson had seen the children, and that he went up to them and kissed them. She remarked at the time to the children that he should not do it again, and told them that if he should, that they should spit in his face." Q. "Whom did she direct this talk to?" A. "To the children." Q. "What was her manner and expression of face?" A. "Very determined."

Referring to another conversation with Dr. Reber, Mrs. Clarkson said in testimony: "He said that he was told by a man that came from Washington county, that Mr. Clarkson had his first wife's coffin in the house six months before she died; and any man that would do that would be cranky enough to leave his wife or to do anything; and he said I ought to hunt that man up." Dr. Reber's testimony about this conversation appears thus: Q. "Didn't you on one occasion say you knew him pretty well; that he had a coffin six weeks for his first wife, before she died?" A. "No, sir, I don't know anything about it. She told me something like it."

Q. "Didn't you tell her she ought to send for the man in Washington county who told you these things?" A. "No, sir, there was simply a conversation in which Mrs. Clarkson made a remark that he had a coffin for his first wife."

These are but a few among many instances appearing in the record, of a direct antagonism between the testimony of the defendant and that of other witnesses, and between her own positions at different points in the controversy. A number of other features in her testimony and in the manner of giving it, are strongly calculated to weaken confidence in its general accuracy. There is apparent, here and there, so overweening a desire to win the fight at any sacrifice, that one might suspect it of blinding its possessor to the impressions, likely to be made by incongruous procedures, upon the minds of others, as well as to the demands of fairness towards an adversary, however unworthy. No breath of suspicion has ever assailed the defendant, as a pure and accomplished lady, who highly adorns her place in society. But the record before us seems to illustrate an old saying, that there are two sides to every character. To a woman, so shown to be shrewd, skiful, well informed, and well supplied with the arts that create an always attractive presence in outer life, it must be an easy task, if she wills it, to darken the marital privacy with a host of petty annoyances, acute indignities, and even negative exasperations, that will make the condition of her life companion intolerable, to the fullest extent of the law's meaning.

The testimony given by the plaintiff is not handicapped by disagreements with itself, or with that given by disinterested witnesses. It covers 185 pages of the record, and occupied about four days in the delivery. Yet we can recall but a single instance in which he was directly contradicted by a disinterested witness, and that was as to a trivial matter, having little or no relation to

the issues on trial, and not at all mentioned in the pleadings.

Some errors are complained of by the appellant, relating chiefly to improper admissions of testimony. It is charged that the court admitted statements of conversations between the plaintiff and the defendant, held when there was no other person present. The charge is not substantially sustained by the record. The court was extremely careful, and frequently admonished the witnesses on this point. The witnesses themselves seemed to bear it particularly in mind, and, on several occasions, when the plaintiff was asked about a conversation with his wife, he answered that it might not be proper for him to relate it, because he could not feel sure that any other person was present at the time. It may be true that, notwithstanding all precautions, some remarks crept in, in contravention of the rule. But no such evidence was so admitted, which could possibly affect the propriety of the final result. There is, therefore, nothing in these objections as grounds for a reversal. *Miller v. Miller*, 14 Mo. App. 418. This is surely one of the cases in which, whatever may be conceded to the appellant on this point, there was other evidence which was competent and ample to bring about the ultimate finding of fact.

Objection is made to the introduction of evidence touching things that occurred after the commencement of the suit. The matters referred to were embodied in the amended petition, and were at no time objected to in the trial court. The defendant's amended answer contained allegations of the same description as to time of occurrence, and evidence was introduced on her part to sustain them. On either side, they were matters rather of aggravation, than of original cause of action or defence. They involve no question which can be considered for the first time on appeal, under all the circumstances.

We have carefully considered this whole record with

a serious regard for the sacredness of the marriage tie. That sacredness is best vindicated by the law when, upon finding that the relation has been divested of its graces by the dereliction of one party, it deprives that party of all further power to abuse its privileges. We think that the testimony in the present record, taken with special reference to its credibility on either side, has developed such a case against the defendant, and that the circuit court was right in its finding to that effect. The orders awarding the custody of the younger children to the defendant, and the other incidental orders, were well considered and appropriate.

The judgment is affirmed, with the concurrence of Rombaur, J.; Thompson, J., dissents.